IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE KNAPP, | ) | CASE NO. 1:14CV1394 |
| | ) | |
| Petitioner, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| LASHANN EPPINGER, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

Petitioner Michelle Knapp ("Petitioner" or "Knapp") brings this habeas corpus action pursuant to 28 U.S.C. § 2254.  Doc. 1.  Knapp is detained at the Northeast Pre-Release Center in Cleveland, Ohio, having been convicted by an Ashtabula County, Ohio, Court of Common Pleas jury of two counts of aggravated vehicular homicide, failure to stop after an accident and operating a vehicle while under the influence.  Doc. 15-2, pp. 27-28.[1]  On September 12, 2011, the trial court merged the vehicular homicide convictions and sentenced Knapp to six years in prison for vehicular homicide and two and one-half years for operating a vehicle under the influence, to be served concurrently, and a one-year sentence for failing to stop after an accident, to be served consecutively, for an aggregate sentence of seven years in prison. Doc. 15-2, pp. 64-66.

On June 25, 2014, Knapp filed her petition for writ of habeas corpus setting forth one ground for relief:

> **Ground One:** The trial court unreasonably determined that trial counsel's representation of Ms. Knapp did not constitute ineffective assistance of counsel and denied her petition for post-conviction relief without a hearing.

---

[1] Doc. page citations are to ECF Doc. page numbers.

Doc. 1, p. 6.  Respondent filed a Return of Writ (Doc. 15) and Knapp filed a Traverse (Doc. 17) and a Motion for Discovery (Doc. 18), which Respondent opposed (Doc. 20).  Respondent argues that Ground One is procedurally defaulted, that a portion of Ground One is not cognizable, and that the balance of Ground One fails on the merits.

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that Ground One be **DISMISSED in part** and **DENIED in part**.[2]

## I.  Factual Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008).  The Ashtabula County Court of Appeals, Eleventh Appellate District of Ohio, set forth the facts underlying Knapp's conviction as follows:[3]

> {¶ 8} Trooper Michael Royko of the Ohio State Highway Patrol testified that, at about 6:45 p.m., on Saturday, December 12, 2009, he was dispatched to the scene of an accident involving a pedestrian on Fargo Drive in Ashtabula, Ohio. Trooper Royko described this portion of Fargo Drive as flat with a posted speed limit of 25 m.p.h. The surface of the road was dry and there were no adverse weather conditions. Fargo Drive is lit by street lamps, but the one nearest the accident was "working intermittently."

> {¶ 9} Trooper Royko collected evidence and drew a sketch of the scene. Trooper Royko testified that along a seventy-five foot stretch of the roadway, he found debris from a vehicle, including the casing for the passenger side view mirror; the victim's two shoes in various locations; the victim's body; and blood smears.

---

[2]  The grounds in the petition that are procedurally defaulted result in a dismissal; the grounds in the petition that are addressed on the merits result in a denial.

[3]  The facts are taken from the Eleventh District Court of Appeals' decision *State v. Knapp*, No. 2011-A-0064 (Ohio Ct. App. May 29, 2012); 2012 WL 1925406 (Ohio Ct. App. May 29, 2012). Knapp has not demonstrated by clear and convincing evidence that the state court's factual findings were incorrect. Accordingly, the state court's findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1); *see also Railey*, 540 F. 3d at 397.

{¶ 10} The victim was identified as Melanie Moretti. Moretti was wearing a black leather jacket with blue jeans.

{¶ 11} The side view mirror was determined to have possibly come from a white Saturn Outlook, the type of vehicle driven by Knapp that evening. There was no evidence in the road (tire or "yaw marks") that the vehicle had braked or taken evasive action before impact with the victim.

{¶ 12} In his report, Trooper Royko identified the following "contributing circumstances" to the accident: the pedestrian was wearing dark clothing, was not using a sidewalk, and was walking in the direction of traffic. Trooper Royko also noted that the driver of the vehicle had failed to maintain ACDA (assured clear distance ahead).

{¶ 13} On Sunday, December 13, Trooper Royko searched for vehicles that matched the side view mirror.

{¶ 14} On Monday, December 14, Trooper Royko received a tip that Michelle Knapp was involved in the accident. After visiting her home and place of employment, Trooper Royko learned that Knapp was at her attorney's office and that the vehicle was at her brother, Mark Knapp's, home.

{¶ 15} Marcus DeCamillo testified that, at about 6:45 p.m., on Saturday, December 12, 2009, he was driving his truck when he was waved down by a young boy on Fargo Drive. DeCamillo testified that he had no difficulty seeing the boy because "the area was lit up" and "because there was snow on the ground and that helps illuminate the area a little more." The boy said his friend had just been hit. After checking the victim's pulse, DeCamillo called 911.

{¶ 16} Timothy Talso, a resident of Fargo Drive, testified that on the evening of Saturday, December 12, 2009, he was watching TV when he heard "a loud noise" and "a loud crash." When he opened the door of his house, he saw a boy holding his arm and a body on the ground. Talso testified that he had no trouble seeing: "I knew where she got hit, because her shoe was laying right underneath the light." Talso testified that the shoe was about 100 feet from his house and that the victim's body was about 70 feet from the shoe. Talso also testified that the street light was going on and off.

{¶ 17} Nicholas Magda, age 15 at the time of the incident, lived on East 39th Street, near Fargo Drive. Magda testified that on the evening of Saturday, December 12, 2009, he was walking on Fargo Drive with Melanie Moretti. Magda described Moretti as being about five feet three inches tall, "on the shorter side." Magda testified that the streetlights were working and that he had no trouble seeing. Magda was wearing a black Tapout hoodie with a white logo on the lower back and blue jeans. Magda testified that Moretti was walking on his right side in the street, while he was in the grass/snow. Magda testified that three cars passed them as they walked and that, when he saw the headlights and heard the approach, they would move to the side.

{¶ 18} Magda testified that he was struck by a vehicle and knocked to the ground without being aware of its approach. "I remember getting up and realizing that I just got hit. And looking up, I seen the back of the silhouette of the car. I remember screaming. * * * And then I realized that Melanie wasn't beside me." According to Magda, the vehicle "just kept going" past a stop sign without stopping, until it made a right turn off of Fargo Drive. "I had looked up at the vehicle and then looked down for her. Then I looked back up, as I was going towards her, and that's when I saw it make the right turn."

{¶ 19} Jeffrey Knapp, Michelle Knapp's older brother, testified that on the afternoon of Saturday, December 12, 2009, he was with his girlfriend, Connie Braat, when he received a call from Knapp to meet her at Buffalo Wild Wings (BW3s) by the Ashtabula Mall. Jeffrey testified that he arrived about 3:30 p.m., and sat at a high top table in the bar area. They were drinking Great Lakes Christmas Ales in 23–ounce glasses. When he first spoke to law enforcement, Jeffrey said that each of them had had about three or four Christmas Ales. Jeffrey also testified that they split an order of quesadillas and chicken fingers.

{¶ 20} Jeffrey Knapp testified that service was slow and that he was drinking faster than Knapp and Braat. When he finished a beer, Knapp and Braat would pour some of their beer into his glass. He testified that this happened about three times, so that Knapp did not consume all the beers that she was served. They left BW3s about 6:00 or 6:30 p.m., to go to their aunt's house, who lived nearby. Jeffrey had Braat drive because he had drunk too much and did not feel okay to drive. Jeffrey testified that neither Knapp nor Braat seemed impaired. Because the aunt was not at home, Jeffrey did not exit his vehicle at the aunt's house and left without interacting with Knapp.

{¶ 21} Jeffrey Knapp testified that, on Sunday, December 13, 2009, he learned that Knapp had been in an accident and had hit a mailbox. He went to his brother, Mark Knapp's, house, where Knapp had spent the night, to view the damage to Knapp's vehicle and then went to look for the mailbox or other object that Knapp had struck.

{¶ 22} Jeffrey Knapp testified that, on the morning of Monday, December 14, 2009, he watched a story on the television news convincing him that Knapp was involved in Moretti's death. He gave his initial statement to law enforcement officers that afternoon.

{¶ 23} Connie Braat testified that on the afternoon of Saturday, December 12, 2009, she was with Jeffrey and Michelle Knapp at BW3s drinking Christmas Ale. In her initial statement to law enforcement, she said that Knapp had consumed 3 or 4 beers. She testified that both she and Knapp were pouring their beers into Jeffrey's glass, and that Knapp had done this at least twice. She testified that they ordered quesadillas and chicken fingers and that she and Knapp ate most of the appetizers. She testified that she was only served two beers, of which she drank about one and a half, and spent about an hour of the time at BW3s outside smoking and talking on the phone. Knapp paid the bill at about 5:30 p.m., but they did not leave the bar for another hour. Braat testified that Knapp did not seem impaired when they left BW3s.

4

{¶ 24} After leaving BW3s, Braat drove to the home of Lonnie VanGilder, the Knapps' aunt, on East 41st Street, which crosses Fargo Drive. Braat testified that Knapp was already there and standing within the storm door. Braat and Jeffrey left after about ten minutes. Later that evening, they received a call from Knapp who said she was driving home and, after that, a call from Mark Knapp who said that Knapp had been in an accident.

{¶ 25} Braat testified that on Sunday, December 13, 2009, she spoke with Knapp. Braat testified that Knapp had heard about a fatal crash on Fargo Drive but believed that she had struck a mailbox, although she was uncertain where that might have occurred.

{¶ 26} Mark Knapp is also Michelle Knapp's brother, and lives on Shadyside Avenue, in Ashtabula. On the evening of Saturday, December 12, 2009, he received a call from Knapp that she had hit a mailbox and that she was coming over. After arriving, Knapp had a glass of wine and fell asleep in a recliner. The next day, Mark learned about the death of Moretti. He drove Knapp to her home and then to church. Mark testified that he drove her because he was suspicious that she was involved in Moretti's death and because he was concerned about the damage to her vehicle.

{¶ 27} On Monday, December 14, 2009, Mark gave a statement to law enforcement, part of which he wrote and part of which was written by a trooper. According to the statement transcribed by the trooper, Mark described Knapp as "impaired or drunk" on Saturday night. At trial, Mark testified that it was the trooper who insisted on using those words, although he signed the statement and did not ask the trooper to correct them. At trial, Mark explained that Knapp seemed very tired, such as he had "never * * * seen her like that before," but that she had no difficulty walking or speaking and did not smell of alcohol.

{¶ 28} Mark Knapp testified that he has Attention Deficit Disorder for which he takes Adderall. Although he is not supposed to drink, he was drinking on Saturday night to celebrate his wife's birthday. Mark testified that the combination of medication and alcohol affects his perception and memory of events.

{¶ 29} Trooper William Bancroft of the Ohio State Highway Patrol testified regarding the damage to Knapp's vehicle. Trooper Bancroft testified that there was "crumpling" to the hood and fender, caused by "an object that was not stationary, possibly a pedestrian." He testified that, underneath the hood, the filler neck of the radiator was cracked so that fluid had leaked out. He testified that the object that was struck "was swept off and went up over the hood and down across the right front and took the [side view] mirror off." He also testified that "it doesn't look like it was a very high speed impact."

{¶ 30} Trooper Daniel Jesse of the Ohio State Highway Patrol testified regarding exhibits obtained from BW3s. Knapp's tab for Saturday, December 12, 2009, indicated that it was opened at 3:32 p.m., and closed at 5:34 p.m. On the tab were eleven 23–ounce Christmas Ales, an order of quesadillas, and an order of chicken tenders. There was a Visa receipt for $100 worth of gift cards purchased by Knapp at 3:20 p.m. On this receipt, Knapp's signature is legible. There was another Visa receipt for the bar tab of $82.76 paid at 5:33

p.m. On this receipt, Knapp's signature is not legible. A tip of $4 was added to the bar tab, but the total amount charged was miscalculated as $86.78 instead of $86.76.

{¶ 31} Catherine Rotko was employed as a second-shift bartender at BW3s on Saturday, December 12, 2009. She testified that it was a BW3 policy that, because of their high alcohol content, a man could only be served a total of three 23–ounce Christmas Ales and a woman could only be served a total of two 23–ounce Christmas Ales. Rotko was familiar with Knapp through BW3s and through mutual acquaintances.

{¶ 32} On Saturday, December 12, 2009, Rotko arrived at BW3s at 5:00 p.m., after Knapp's tab had been closed. There were five people at Knapp's table and all glasses were empty. She came to Knapp's table to clean up a glass that was broken on the table in front of Knapp's seat. Thereafter, Knapp and her friends left the table. Rotko testified that she found a paper left on the table belonging to Knapp and that Knapp's purse was left on a chair. Knapp came back into the bar for her purse and spoke with Rotko for a few minutes. Rotko described Knapp's condition as impaired. According to Rotko, Knapp was unsteady and was continually leaning on her brother, Jeffrey, for support. Knapp was also slurring, "repeated herself a lot," and "seemed really confused." When they had finished speaking, Knapp was "stumbling and staggering" as she walked toward the exit.

{¶ 33} Dr. Pamela Lancaster, the coroner for Ashtabula County, testified that the cause of Moretti's death, according to the Coroner's Verdict, was "blunt impacts to head, neck, chest and extremities." Dr. Lancaster testified that the manner of death, according to the Coroner's Verdict, was a "homicide." Dr. Lancaster explained that classification of "homicide" means "the taking of the life of one person [by] the other, [whether] intentional or unintentional" and that this classification applied to all pedestrian deaths caused by an automobile.

{¶ 34} Dr. Dan Galita is a Forensic Pathologist and Deputy Medical Examiner for the Cuyahoga County Coroner's Office, and conducted the autopsy of Melanie Moretti. Using autopsy photographs, Dr. Galita explained the extent of Moretti's injuries. These injuries included abrasions to her forehead, right temple, right eyebrow, bridge of the nose, the left forearm, and the back. There were contusions behind the right knee, on both sides of the torso, and the left buttock/lower back. Internally, there were "occipital skull fractures and a ring fracture of the base of the skull" and "contrecoup contusions." There was also a cervical spine fracture at the C6/C7 level. Dr. Galita testified that Moretti's injuries were caused by a "very severe hyperextension of the neck backwards, which broke the spine and injured the cord." Further, "all these injuries are consistent with the impact with the hood of a car, because the body is hit hard, hyperextends back, slides on the hood and then rolls * * * over and fall[s] on the ground."

{¶ 35} Dr. Galita also testified that Moretti's injuries were "consistent with a medium speed, around 35, 45 miles an hour" and began to explain the nature of low, medium, and high speed impacts. Counsel for Knapp objected and moved for a mistrial, primarily "based on the fact that this witness's testimony is not contained in his report." The trial court overruled the motion for mistrial, and instructed the jury: "Ladies and gentlemen, the testimony that you recently heard concerning the low speed, medium speed, high

6

speed impact * * * any of that testimony you are instructed to disregard, as though you never heard it."

{¶ 36} Lieutenant Jerad Sutton, of the Ohio State Patrol, testified regarding the written statement given by Knapp on Monday, December 14, and admitted into evidence. According to her written statement, Knapp had "about three" drinks at BW3s on the night in question and did not feel impaired when she left for her aunt's house. She drove down Fargo Drive, which she travelled "a few times a month or less." She was aware that she "struck something," an unidentified object, on Fargo Drive. She did not recall seeing any pedestrians. That evening, she only noticed "slight" damage to her vehicle. She learned that she had struck a person for the first time on Monday, December 14, when her brother, Jeffrey, called and told her.

{¶ 37} Lieutenant Sutton also testified regarding a call Knapp made to her vehicle's OnStar System, at 7:18 p.m., on December 12, 2009. The transcript of the call indicates that Knapp initially told the OnStar operator that she has a problem and asked about a five-digit number. Knapp then asked the operator about her route. The operator responded, "no we can only see the prior route which was Gilmour Academy Middle * * * School." Knapp thanked the operator and terminated the call.

{¶ 38} Douglas Rohde, a supervisor of chemistry and toxicology at the Lake County Crime Laboratory in Painesville, testified and was asked to give an opinion as to Knapp's probable blood alcohol content (BAC) on the evening of December 12, 2009, under various factual scenarios. Rohde testified that, according to the information that the brewery is required to provide on the product's label, the alcohol by volume content of Great Lakes Christmas Ale is 7.5 percent. Rohde noted, however, that this figure is an approximation and that the actual alcohol content is "rarely exactly what is printed on the bottle." In the present case, Rohde was unable to test the actual beverage or batch consumed by Knapp.

{¶ 39} Rohde testified as to Knapp's BAC with the assumptions that she was a heavy drinker (thus producing a more conservative estimate of her BAC, given the higher alcohol elimination rate of heavier drinkers) and had not eaten food. Based on a reported weight of 160 pounds, Rohde opined that Knapp's BAC would be between 0.075 and 0.110 after consuming two 23–ounce Christmas Ales, between 0.165 and 0.200 after consuming three 23–ounce Christmas Ales, and between 0.255 and 0.290 after consuming four 23–ounce Christmas Ales. Rohde testified that factoring for the consumption of food would reduce Knapp's actual BAC by five to ten percent.

{¶ 40} The following witnesses gave testimony at trial and on behalf of Knapp:

{¶ 41} Barbara Fusselman was employed as a day-shift bartender at BW3s on Saturday, December 12, 2009. Fusselman testified that she waited on Knapp and a party of six or seven other persons that afternoon. Fusselman testified that she only served Knapp two Christmas Ales that afternoon, with about an hour of time intervening. Fusselman did not notice any change in Knapp's demeanor during the course of the afternoon. Fusselman further testified that no one at Knapp's table was served more than two Christmas Ales.

{¶ 42} Michelle Knapp testified that she arrived at BW3s on Saturday, December 12, 2009, before Jeffrey and Braat. She purchased gift cards and then ordered a beer, which was served about the time Jeffrey and Braat arrived. Because service was slow, she poured some of her beer into Jeffrey's glass. About an hour later, Knapp ordered a second Christmas Ale. Again, she poured some of the beer into Jeffrey's glass to refill it. Thereafter, she ordered a third Christmas Ale, which she directed the bartender to serve to Jeffrey. During the course of the afternoon, they ordered and consumed a chicken quesadilla and boneless chicken wings, which came with fries. Knapp testified that she only consumed about one and a half of the two beers she was served.

{¶ 43} Michelle Knapp testified that they finished drinking about 5:30 p.m., at which time someone bumped the table and broke a glass, and left the bar about 6:30 p.m. She returned to the bar with Jeffrey to retrieve her keys. Knapp testified that while she spoke with Rotko she held on to Jeffrey "to keep him straight" as he was a little unsteady.

{¶ 44} Michelle Knapp testified that Fargo Drive was "fairly dark" that evening. She was driving at an appropriate speed with the radio on. Knapp remembered "hitting something, and it * * * made a little bit of bump, but * * * it didn't make any real impact." Knapp guessed that it was a mailbox or something brought into the road by a snow plow. At her aunt's house, she noticed some damage to her vehicle ("just the front corner"). She did not notice the full extent of the damage, including the missing side view mirror, until the next day.

{¶ 45} After leaving her aunt's house, Michelle Knapp testified that she attempted to redial a telephone number using her vehicle's OnStar Service, but inadvertently summoned a navigational operator.

{¶ 46} Michelle Knapp testified that she avoided driving her vehicle on Sunday, December 13, 2009, so Jeffrey would be able to look at the damage. Although she learned of the fatality on Fargo Drive the next day, Knapp did not think she could be involved because she did not know the name of the street she was travelling on when she struck the object. Knapp testified that she only realized her involvement with Moretti's death on the morning of Monday, December 14, 2009, when Jeffrey gave her a description of the vehicle involved.

{¶ 47} Regarding her written statement that she had had "about three" drinks, Michelle Knapp explained that this meant the equivalent of three drinks, rather than that she had consumed three 23–ounce Christmas Ales.

*State v. Knapp*, No. 2011-A-0064, 2012-Ohio-2354, 2012 WL 1925406, at *2-8 (Ohio Ct. App. May 29, 2012).

## II. Procedural Background

**A.  State Conviction**

On January 11, 2010, an Ashtabula County Grand Jury indicted Knapp on two counts of aggravated vehicular homicide, O. R.C. § 2903.06; failure to stop after an accident, O.R.C. § 4549.02; and operating a vehicle while under the influence, O.R.C. § 4511.19.  Doc. 15-2, pp. 1-3.  Knapp pled not guilty to all charges.  Doc. 15-2, p. 4.

The case proceeded to trial.  On July 29, 2011, the jury found Knapp guilty of all charges.  Doc. 15-2, pp. 27-29.  Knapp moved for an acquittal or, alternatively, for a new trial.  Doc. 15-2, p. 30.  The court denied Knapp's motion.  Doc. 15-2, p. 57.

On September 12, 2011, the court merged the vehicular homicide convictions and sentenced Knapp to six years in prison, two and one-half years for operating a vehicle under the influence, to be served concurrently, and a one-year sentence for failing to stop after an accident, to be served consecutively, for an aggregate sentence of seven years in prison. Doc. 15-2, pp. 64-66.

**B.  Direct Appeal**

On October 11, 2011, Knapp, through counsel, appealed to the Ohio Court of Appeals.  Doc. 15-2, p. 76.   In her brief, she presented the following assignments of error:

1.    The trial court committed reversible error in failing to instruct the jury relative to the legal requirements for pedestrians as set forth in R.C. § 4511.50.

2.    The trial court committed reversible error in calling Connie Braat, Mark Knapp, and Jeffrey Knapp as witnesses of the court.

3.    The trial court committed reversible error when it denied Michelle Knapp's motion for mistrial presented during the testimony of Dr. Dan A. Galita.

4.    The trial court committed reversible error in admitting into evidence gruesome and irrelevant autopsy photographs.

5.    The trial court committed reversible error in allowing the jury to hear evidence of the Coroner's conclusion that Melanie Moretti's death was a homicide.

6.      The jury conviction was against the manifest weight of the evidence.

7.      The cumulative error committed in this case deprived Michelle Knapp of a fair trial.

Doc. 15-2, pp. 86-90.  On May 29, 2012, the state Court of Appeals affirmed the judgment of the trial court.  Doc. 15-2, p. 169.  Knapp did not appeal.

### C. Petition for Post-Conviction Relief

On May 18, 2012, Knapp, through counsel, filed a petition for post-conviction relief in the trial court based on ineffective assistance of trial counsel.  Doc. 15-2, p. 199.  She requested an evidentiary hearing.  Doc. 15-2, p. 242.  She attached numerous documents in support of her petition, including a supplement to her petition.  Doc. 15-2, pp. 248-349; Doc. 15-3, p. 350.  Knapp challenged her attorney's performance before and during trial, including asserting that "trial counsel's unrealistic advice to Ms. Knapp regarding her plea bargaining options constituted ineffective assistance."  Doc. 15-2, p. 227.  On July 9, 2012, the trial court denied her request for a hearing and dismissed her petition. Doc. 15-3, pp. 52-63.

On August 2, 2012, Knapp appealed.  Doc. 15-3, p. 64.  She presented the following assignments of error:

1. The trial court erred by not conducting an evidentiary hearing in light of the new evidence provided by Michelle Knapp in her petition for post-conviction relief.

2. The trial court erred by not granting Michelle Knapp's petition for post-conviction relief.

Doc. 15-3, pp. 80-81.  On March 11, 2013, the Ohio Court of Appeals affirmed the trial court's judgment.  Doc. 15-3, p. 122.

On April 24, 2013, Knapp, though counsel, appealed to the Ohio Supreme Court.  Doc. 15-3, p. 151.  Her memorandum in Support of Jurisdiction contained only one proposition of law:

> 1. A Petitioner Who Raises A Substantive Ground For Relief, Based Upon Her Counsel's Ineffective Communication Of A Plea Offer, Which Cannot Be Resolved As A Matter Of Law, Is Statutorily Entitled To An Evidentiary Hearing To Determine Whether Her Claim Justifies Relief.

Doc. 15-3, p. 155.  On June 26, 2013, the Ohio Supreme Court declined jurisdiction.  Doc. 15-3, p. 218.

### D.  Federal Habeas Petition

On June 25, 2014, Knapp, through counsel, filed a petition for a writ of habeas corpus (Doc. 1) and a brief in support (Doc. 2).  She states the following Supporting Facts for her single ground for relief:

> **Supporting Facts**:  Trial counsel provided ineffective assistance because he failed to investigate, gave Ms. Knapp unrealistic advice regarding her plea options, failed to present expert testimony at trial which would have defeated the prosecution's claims, failed to object to certain evidence, and failed to challenge partial jurors, which deprived Ms. Knapp of a fair trial.

Doc. 1, p. 6.  In her brief, she requests an evidentiary hearing pursuant to 28 U.S.C. § 2254(e). Doc. 2, p. 47.

On October 2, 2014, Respondent filed a Return of Writ.  Doc. 15.  Respondent argues that all of Ground One is procedurally defaulted and, additionally, that a portion of Ground One is not cognizable and the balance fails on the merits.  Knapp filed a Traverse (Doc. 17) and a Motion for Discovery (Doc. 18).  Respondent opposed Knapp's motion (Doc. 20) and Knapp filed a reply brief (Doc. 21).

### III. Law

### A.  Standard of Review under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 ("AEDPA"), apply to Knapp's habeas petition because she filed it after

the effective date of the AEDPA.  28 U.S.C. § 2254; *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 20*07).  Under the AEDPA, a petitioner must meet certain procedural requirements in order to have her claims reviewed in federal court.  *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 20*06).  "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (20*01).  Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 20*06).  Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id*. at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).  In contrast, when state court remedies are no longer available, procedural default rather than exhaustion applies.  *Id*.

**Procedural Default.**  Procedural default may occur in two ways.  *Id*.  First, a petitioner procedurally defaults a claim if she fails "to comply with state procedural rules in presenting [her] claim to the appropriate state court." *Id*.  In *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 19*86), the Sixth Circuit provided four prongs of analysis to be used when determining whether a claim is barred on habeas corpus review due to petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim and (4) whether the petitioner can demonstrate cause for her failure to follow the rule and that she was actually prejudiced by the alleged constitutional error.  *See also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach

the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id*.  While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review.  *Williams*, 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered.  *Coleman*, 501 U.S. at 750.

**Merits Review**.  In order to obtain habeas relief under  28 U.S.C. § 2254(d), a petitioner must show either that the state court decision (1) resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law as determined by the United States Supreme Court ("contrary to" clause); or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings ("unreasonable application" clause).  *Id*.

"Under the 'contrary to' clause, a federal habeas court may grant a writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  Under the "unreasonable application" clause, a federal habeas court

may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id. at 413*. "Clearly established federal law" refers to the holdings, not dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision, as well as legal principals and standards flowing from Supreme Court precedent. *Id.* at 412; *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). A state court is not required to cite Supreme Court precedent or reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

In determining whether the state court's decision involved an unreasonable application of law, the court employs an objective standard. *Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "A state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

## IV. Analysis

### A. All But One of Knapp's Ineffective Assistance of Trial Counsel Claims are Procedurally Defaulted

Knapp argues that trial counsel was ineffective because "he failed to investigate, gave Ms. Knapp unrealistic advice regarding her plea options, failed to present expert testimony at trial which would have defeated the prosecution's claims, failed to object to certain evidence, and failed to challenge partial jurors."  Doc. 1, p. 6.  Respondent contends that these claims are procedurally defaulted.  Doc. 15, pp. 19-20.  The undersigned agrees that, with the exception of Knapp's claim regarding plea negotiation advice, these claims are procedurally defaulted.

### 1.  Knapp's claims regarding trial errors were never presented to the Ohio Supreme Court.

In Knapp's state postconviction petition, and on appeal to the Ohio Court of Appeals, Knapp complained that trial counsel was ineffective because he failed to challenge certain evidence and jurors and failed to investigate and develop additional evidence favorable to Knapp.  *See* Doc. 15-2, pp. 212-220 (postconviction petition); Doc. 15-3, pp. 1-4 (supplement to petition); Doc. 15-3, pp. 84-96 (appellate brief).  However, Knapp did not raise these issues in her appeal to the Ohio Supreme Court.  *See* Doc. 15-3, p. 155 (Supreme Court brief).  Accordingly, these claims are procedurally defaulted because Knapp failed to present them through a complete round of Ohio's established appellate review procedures before presenting them here.  *O'Sullivan*, 526 U.S. at 845 ("state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review procedures before [s]he presents h[er] claims to a federal court.").

Knapp argues that she raised all her ineffective assistance of counsel claims in her brief to the Ohio Supreme Court because in that brief she "also argued how her counsel was ineffective in a myriad of other ways" and that the Ohio Supreme Court was "on notice[] that her counsel was ineffective in other respects culminating in the plea bargaining process."  Doc. 17, pp. 22-23.  The undersigned disagrees.  First, Knapp clearly set forth only one proposition of

law and one argument in her brief to the Ohio Supreme Court—defense counsel was ineffective during plea negotiations. *See* Doc. 15-3, pp. 155-156. And she only cited case law pertaining to ineffective assistance of trial counsel during plea negotiations. Doc. 15-3, pp. 156, 163-166. The complaints about trial counsel's alleged ineffectiveness in failing to investigate and develop evidence were set forth in the "statement of facts" portion of her Ohio Supreme Court brief; she did not argue these facts. Doc. 15-3, pp. 161-163. *See Blackmon v. Booker,* 394 F.3d 399, 400-401 (6th Cir. 2004) (failure to "develop any cogent arguments regarding [alleged] rights beyond the naked assertion that they were violated" is insufficient to fairly present claim). Finally, the page limitation set forth by the Ohio Supreme Court does not obviate the requirement to fully present her arguments, as Knapp appears to assert (Doc. 17, p. 23). Knapp procedurally defaulted all her claims regarding ineffective assistance of trial counsel, with the exception of counsel's ineffectiveness during plea negotiations.

### 2. *Res Judicata* does not bar Knapp's ineffective assistance claim regarding plea negotiations

Respondent contends that Knapp's ineffective assistance of counsel claim is procedurally defaulted because the Ohio Court of Appeals held that this claim was barred by the doctrine of *res judicata*. Doc. 15, p. 19. Knapp submits that the state Court of Appeals did not apply *res judicata* to her claim regarding plea negotiations. Doc. 17, p. 17. After reviewing the state Court of Appeals' decision, the undersigned agrees with Knapp that the Ohio Court of Appeals did not apply the *res judicata* bar to her plea negotiation claim.

In denying Knapp's petition for postconviction relief, the state trial court applied the *res judicata* bar only to Knapp's claim that counsel was ineffective for failing to challenge certain jurors because this claim was apparent from the record and could have been raised on direct appeal. Doc. 15-3, p. 62. The trial court decided Knapp's other claims, including that counsel

16

was ineffective in advising her during plea negotiations, on the merits.  Doc. 15-3, pp. 54-62.
The court rejected Knapp's plea negotiation claim, finding that she provided "nothing more than
her own self-serving affidavit . . . [that] provides no credible information which would overcome
the strong presumption that Petitioner's experienced attorney advised her of the possible
consequences of rejecting any plea offers by the prosecution."  Doc. 15-3, p. 58.

The state Court of Appeals, affirming the trial court's judgment, observed, "Many of the
arguments raised in Knapp's Petition for Post–Conviction Relief could have been raised without
resort to extrinsic evidence. Knapp's affidavit demonstrates her awareness of Attorney
Bobulsky's alleged deficiencies with respect to . . . the inadequacy of his advice in plea
negotiations." *Knapp*, 2013 WL 942724, at *5.  The court found it "inexplicable" that she failed
to "challenge the competency of his representation on direct appeal." *Id.*  Despite this assertion,
the court appears to have applied the *res judicata* bar to only one of Knapp's claims, i.e.,
Knapp's contention that expert opinions she provided "constituted evidence dehors the record
sufficient to avoid the application of res judicata." *Id.* at *6.  Thus, the Ohio Court of Appeals
did not apply the *res judicata* bar to Knapp's ineffective assistance claim with respect to plea
negotiations.[4]

### B.  Knapp's Ineffective Assistance of Trial Counsel Claim Regarding Plea Negotiations Fails on the Merits

#### 1.  Legal Standard

Knapp argues that, due to trial counsel's ineffectiveness, her Sixth Amendment right to
counsel during plea negotiations was violated.  Doc. 17, p. 32.  The Sixth Amendment provides,

---

[4]  The Ohio Court of Appeals decision is not a model of clarity; however, as the state Court of Appeals commented,
the two issues that Knapp raised were presented jointly and thus considered jointly; this may have added to the
confusion regarding the *res judicata* section.   Indeed, Judge Cannon, concurring in the opinion, would have found
that Knapp failed to preserve her claim regarding plea negotiations because she did not raise it as an assignment of
error and failed to mention the issue at all in her brief. *Knapp*, 2013 WL942724, at *13.  Judge Rice, partially
dissenting, would have found that Knapp was entitled to a hearing on her plea negotiation claim. *Id.*

in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for h[er] defense."  U.S. Const. Amend. VI.  A defendant has a Sixth Amendment right not just to counsel but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  This right extends to the right to effective counsel in plea negotiations.  *Missouri v. Frye*, 132 S.Ct. 1399, 1406 (2012).  Under the first prong of the *Strickland* test, a petitioner must show that counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case.  466 U.S. at 688; *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012).  To satisfy the second, "prejudice," prong under *Strickland*, a petitioner must demonstrate a reasonable probability that, but for counsel's ineffectiveness, (1) she would have accepted the earlier plea offer if she had the benefit of effective assistance of counsel; (2) the plea would have been accepted by the court; and (3) the end result would have resulted in a plea to a lesser charge or a lesser sentence imposed.  *Id.* at 1386; *Frye*, 132 S.Ct. at 1409.

Since Knapp's claim of ineffective assistance of counsel regarding plea negotiations was adjudicated on the merits by the Ohio Court of Appeals, this Court must give AEDPA deference to that adjudication.  *Perkins v. McKee*, 411 Fed. App'x 822, 828 (6th Cir. 2011).  In *Harrington*, the Supreme Court emphasized the deference that federal courts must give state courts in reviewing *Strickland* claims under AEDPA:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. . . . An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. . . . The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so . . . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).

18

When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 103-105 (internal citations omitted).[5]

### 2. The Ohio Court of Appeals' Decision

In addressing Knapp's claim, the Ohio Court of Appeals recognized that *Lafler* and *Frye*

govern claims of ineffective assistance of counsel during plea negotiations:

{¶ 56} With respect to the claim that Attorney Bobulsky failed to properly counsel Knapp in plea negotiations, the United States Supreme Court has recently affirmed that criminal defendants are entitled to the effective assistance of counsel during plea nego[ti]ations. *Lafler v. Cooper*, ——U.S. ——, 132 S.Ct. 1376, 1384, 182 L.Ed.2d 398 (2012); *Missouri v. Frye*, —— U.S. ——, 132 S.Ct. 1399, 1407–1408, 182 L.Ed.2d 379 (2012). Claims of ineffective assistance may be based on trial counsel's advice to reject a plea offer on the grounds that the defendant could not be convicted at trial. *Lafler* at 1384. To satisfy the prejudice requirement in such circumstances, "a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court ( i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of interve[]ning circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id*. at 1385; *Frye* at 1409.

{¶ 57} In [] her affidavit, Knapp made the following claims regarding Attorney Bobulsky's performance during plea negotiations:

{¶ 58} 41. From the commencement of his representation of me on December 14, 2009 through the conclusion of trial, Mr. Bobulsky instructed me that I would take no plea offer which involved incarceration.

{¶ 59} 42. I understand now that the State was prepared to reduce the charges if I were willing to accept some period of incarceration.

{¶ 60} 43. Had Mr. Bobulsky advised me of my realistic exposure to a conviction and significant period of incarceration, even though innocent, I would have agreed to plead guilty and do some period of incarceration so as to minimize the effect of these proceedings on my daughter and family.

---

[5]  Because the Ohio Court of Appeals did not apply a procedural bar to Knapp's claim and considered it on the merits, the undersigned applies the AEDPA deferential review to the state Court of Appeals' decision.  The undersigned notes that, if a *de novo* standard is applied to Knapp's claim, the result would be the same.

{¶ 61} 44. Instead, Mr. Bobulsky led me to believe that the State's case was weak and that I had nothing to be concerned with which would warrant consideration of a guilty plea or incarceration.

{¶ 62} In considering this argument, the trial court found that Knapp's "affidavit provide[d] no credible information which would overcome the strong presumption that Petitioner's experienced attorney advised her of the possible consequences of rejecting any plea offers by the prosecution."

{¶ 63} There was no abuse of discretion in the trial court's rejection of Knapp's claims. Knapp bore the burden of demonstrating sufficient operative facts of trial counsel's lack of competence and resulting prejudice. In the affidavit, there are no specific details about the plea negot[i]ations or Attorney Bobulsky's performance, apart from the statements that "the State was prepared to reduce the charges" and that "Bobulsky led me to believe the State's case was weak." Bobulsky's professional estimation that the State's case was "weak," without more, does not rise [to] the level of ineffective assistance. There are no unequivocal statements as to what offers, if any, the State was willing to entertain or that Bobulsky failed to communicate such offers or that he rejected such offers without her consent. Without the details of an actual plea offer, it is impossible to evaluate the probability of such an offer being accepted by the court and how the outcome of such a plea might have differed from the outcome at trial.

{¶ 64} Also, the trial court was within its discretion to doubt the credibility of Knapp's claims. *State v. Calhoun*, 86 Ohio St.3d 279, 714, 714 N.E.2d 905 N.Ed.2d 905 (1999), at paragraph one of the syllabus ("[i]n reviewing a petition for postconviction relief filed pursuant to R.C. 2953.21, a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge their credibility in determining whether to accept the affidavits as true statements of fact"). That Attorney Bobulsky failed to advise her, or that she failed to appreciate, the "realistic exposure to a conviction and sign[i]ficant * * * incarceration" is questionable in light of the seriousness of the charges and the undisputed fact that Knapp struck and killed Moretti with her vehicle after drinking for several hours. *State v. Fry*, 9th Dist. No. 26121, 2012–Ohio–2602, ¶ 19 (rejecting claim, based on "self-serving affidavit," that the petitioner would have accepted a plea offer if trial counsel had consulted outside counsel or his family members).

*Knapp*, 2013 WL 942724, at *9-10.

### 3. Knapp's Arguments

In her brief in support of her Petition, Knapp argues that trial counsel was ineffective because he advised her that she should not accept a plea deal that involved any jail time because the state's case against her was "weak."  Doc. 2, p. 33.  She relied on his advice, "not

comprehending the fact that jail time was even a remote possibility," and "summarily rejected" the prosecution's plea offer.  Doc. 2, pp. 33, 35.

Although Knapp recites the correct standard of review, Doc. 2, pp. 23, 32-36, she does not explain how the Ohio Court of Appeals decision is contrary to or involved an unreasonable application of Supreme Court precedent.  *See* 28 U.S.C. § 2254(d).  Nor does she describe how the Ohio Court of Appeals' decision was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  *See Harrington*, 562 U.S. at 101.  Instead, she merely states in conclusory fashion that counsel's ineffective assistance caused her to reject a plea deal and that she has been prejudiced.  Doc. 2, pp. 33-36.  Such a conclusory statement is insufficient.

The Court of Appeals upheld the trial court's finding that it was incredible that Knapp's counsel failed to advise her, or that she failed to appreciate on her own, her potential exposure to jail time "in light of the seriousness of the charges and the undisputed fact that Knapp struck and killed Moretti with her vehicle after drinking for several hours."  *Knapp*, 2013 WL942724, at *10.  Knapp does not advance any argument as to why this finding is so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  *See Harrington*, 562 U.S. at 103.  Exaggerating her argument in her Petition—she claims that she did not "comprehend" that "jail time was even a *remote* possibility" (Doc. 2, p. 36) (emphasis added)—only serves to bolster the state Court of Appeals' finding that her assertion is not credible given the severity of the charges and that she did, in fact, hit and kill a person with her car after drinking alcohol.

Moreover, in attempting to show that she was prejudiced by the ineffective assistance of trial counsel, Knapp's affidavit claims that the state was "prepared" to reduce the charges if she would accept "some" period of incarceration.  *Knapp*, 2013 WL942724, at *9.  However, Knapp

does not allege that, under the state's plea offer, she would have received less jail time than she ultimately received.[6]  *See Frye*, 132 S.Ct. at 1409 ("To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time."). Nor does she allege that trial court would have accepted the plea, as she is also required to show. *See id*.  Knapp's affidavit, moreover, does not aver that trial counsel failed to advise her; Knapp states, "I *understand* now that the State was prepared to reduce the charges." (Emphasis added) She does not state that her attorney did not tell her, or that she later discovered new information. *See Knapp*, 2013 WL942724, at *9 ("In [Knapp's] affidavit, there are no specific details about the plea negotiations" or her attorney's performance beyond, "the State was prepared to reduce the charges.").  Rather, Knapp describes a recent realization.  Knapp's apparent recent realization, after the fact, does not make trial counsel's communications faulty.  Thus, Knapp cannot show that the Ohio Court of Appeals' decision is contrary to Supreme Court precedent or is so lacking in justification that there is an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  *See Harrington*, 562 U.S. at 103.

In her Traverse, Knapp relies on *Sawaf v. U.S.*, 570 Fed. App'x 544 (6th Cir. 2014), to support her argument.  Doc. 17, p. 33.  *Sawaf* is not Supreme Court precedent; nor did it apply the deferential AEDPA standard to a state court opinion.  570 Fed. App'x at 547 (ineffective assistance of counsel claim was a mixed question of law and fact subject to *de novo* review).[7]

---

[6]  Under *Lafler* and *Frye*, the petitioner must show  prejudice by demonstrating that the end result would have resulted in a plea to a lesser charge or a lesser sentence imposed. *Lafler*, 132 S. Ct. at 1386; *Frye*, 132 S.Ct. at 1409. Knapp only argues prejudice with respect to her sentence.

[7]  In any event, *Sawaf* is not on point.  In *Sawaf*, the defendant alleged that trial counsel never informed him of his sentencing exposure under the sentencing guidelines.  570 Fed. App'x at 546.  The plea deal the defendant rejected offered a 41-month sentence; the U.S. Sentencing Guidelines imposed a mandatory 235 month sentence.  *Id*.  Here, Knapp does not allege that her trial counsel failed to inform her of a possible sentence she could receive, only that he did not advise her of her "realistic exposure to a conviction and significant period of incarceration" because he "led her to believe" the state's case was "weak."  *Knapp*, 2013 WL942724, at *9.

Here, the Ohio Court of Appeals' decision was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent.  The state Court of Appeals applied the law in *Lafler* and *Frye* when it considered Knapp's claims.  In *Lafler*, the petitioner's trial counsel did not "merely offer[] a prediction about the outcome of the trial" to the petitioner in discussing a plea offer; instead, counsel advised him, erroneously, that he could not legally be convicted of murder because he had shot a person below the waist.  *Cooper v. Lafler*, 376 Fed. App'x 563, 571 (6th Cir. 2010); *Lafler*, 132 S. Ct. at 1384.[8]  Here, Knapp's affidavit states that her counsel "led her to believe that the State's case was weak and that I had nothing to be concerned with which would warrant consideration of a guilty plea or incarceration."  *Knapp*, 2013 WL942724, at *9.  Rejecting Knapp's argument, the state Court of Appeals determined that "[counsel's] professional estimation that the State's case was weak, without more, does not rise [to] the level of ineffective assistance."  *Id.*  This finding is not contrary to or an unreasonable application of *Lafler*.  Indeed, the Sixth Circuit distinguished the situation present in *Lafler*—counsel erroneously providing incorrect advice on a matter of law— with a situation similar to the one presented here—counsel offering a prediction about the outcome of trial. 376 Fed. App'x at 571.  Moreover, Knapp's affidavit does not assert that her counsel told her the case against her was weak; she alleged counsel "led her to believe" the case against her was weak.  *Knapp*, 2013 WL942724, at *9.  Such watery allegations, without specific details concerning counsel's performance, do not suffice to demonstrate counsel's ineffectiveness, as the state Court of Appeals found.  *Id.*

Finally, Knapp presents a new argument in her Traverse—that her trial counsel did not communicate the state's plea offer to her.  Doc. 17, p. 34.  She attempts to demonstrate that her

---

[8]  On appeal to the United States Supreme Court, the parties agreed that counsel's performance was deficient and the Court did not review that issue.  *Lafler*, 132 S.Ct. at 1384.

affidavit supports her new assertion by arguing that, because she only understood later that the state was prepared to reduce the charges, it follows that "counsel did not communicate to her the State's offer before trial."  Doc. 17, p. 34.  New arguments presented in a traverse are not properly before a federal habeas court.  *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) (arguments first addressed in a traverse rather than in a habeas petition were not properly before the district court); *Jalowiec v. Bradshaw*, 657 F.3d 293, 311-312 (6th Cir. 2011).  Even if Knapp's argument had been properly presented, her argument fails.  Although "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused[,]" *see Frye*, 132 S.Ct. at 1408, Knapp's affidavit does not contain an "unequivocal statement" that trial counsel failed to communicate a plea offer to her, as noted by the state Court of Appeals.  *Knapp*, 2013 WL942724, at *9.  Again, Knapp does not argue, nor can it be said, that the state Court of Appeals' finding is so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  *Harrington*, 562 U.S. at 103.  Accordingly, the undersigned recommends that Knapp's ineffective assistance of trial counsel claim regarding plea negotiations fails on the merits and should be denied.

### C.  Knapp's Postconviction Hearing Claim is Not Cognizable

Knapp argues that the state court erred when it denied her petition for post-conviction relief without a hearing. Doc. 1, p. 6; 17, pp. 29-32.  Respondent submits that Knapp's claim is not cognizable on federal habeas corpus review and should be denied.  Doc. 15, p. 21.  In her Traverse, Knapp does not dispute Respondent's characterization of the law but states that she raised this argument in her Petition "because, based on the evidence she presented in her post-conviction petition and supplement, she should have been granted one."  Doc. 17, p. 29.  She requests "a full and fair opportunity to present all of her claims to this Court in habeas corpus

24

and to have the opportunity to conduct discovery, the opportunity to amend the petition, the opportunity (and the ability) to fully investigate the claims and to present evidence in support of her claims to this Court without any deference being given to the factual findings of the state courts."  Doc. 17, p. 32.

It is settled law in the Sixth Circuit that errors in post-conviction proceedings, such as the failure to grant evidentiary hearings, are outside the scope of federal habeas review.  *Cornwell v. Bradshaw*, 559 F.3d 398, 411 (6th Cir. 2009) (petitioner's claim that the state court improperly denied him an evidentiary hearing not cognizable in habeas corpus proceedings); *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007); *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986) ("We decline to allow the scope of the writ to reach this second tier of complaints about deficiencies in state post-conviction proceedings.").  Accordingly, Knapp's claim that the state court erred when it denied her petition for postconviction relief without a hearing is not cognizable and should be denied.

### D.  Knapp is Not Entitled to an Evidentiary Hearing

In her brief in support of her Petition, Knapp request a "full hearing on the merits" under 28 U.S.C. § 2254(e), which provides,

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.
>
> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
>> (A) the claim relies on—
>>
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e).  Knapp states, "[b]ecause Ms. Knapp developed the factual basis of a claim in the State court proceedings, this Court should grant Ms. Knapp an evidentiary hearing to fully develop the record and give this Court the opportunity to hear this new evidence and sworn testimony."  Doc. 2, p. 48.  She makes no attempt to identify what portion of 28 U.S.C. § 2254(e) she believes entitles her to relief and no section appears to apply to her case such that would warrant an evidentiary hearing.  *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011) (federal habeas court is limited to the evidence that was before the state court); 28 U.S.C. §2254(e)(1) (state court determination of a factual issue is presumed to be correct).  Accordingly, her request for a hearing is denied.

### E.  Knapp is Not Entitled to Discovery

Knapp filed a Motion for Discovery.  Doc. 18.  She seeks discovery in the form of depositions of her trial counsel, the prosecutor, and "potential witnesses who may have overheard conversations between trial counsel and Petitioner regarding plea-bargaining options."  Doc. 18, p. 6.

"Habeas petitioners have no right to automatic discovery.  A district court has discretion to grant discovery in a habeas case upon a fact specific showing of good cause under Rule 6[(a) of the Rules Governing Section 2254 Cases]."  *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (citing *Bracy v. Gramley*, 520 U.S. 899 (1997); *Byrd v. Collins*, 209 F.3d 486, 515–16 (6th Cir. 2000)).  A court may provide discovery when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that [s]he is ... entitled to relief."  *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting

*Bracy*, 520 U.S.at 908–909).  A petitioner must articulate specific allegations of fact; "Rule 6 does not sanction fishing expeditions based on a petitioner's conclusory allegations." *Id*.

As described in this Report and Recommendation, Knapp has failed to advance specific allegations of fact to support a reasonable belief that she may, if the facts are fully developed, be able to demonstrate she is entitled to relief.  *See id*.  Accordingly, her motion for discovery is denied.

### V. Conclusion and Recommendation

For the reasons stated above, the undersigned recommends that Knapp's Petition be **DISMISSED in part** and **DENIED in part**.  Knapp's ineffective assistance of trial counsel claim based on plea negotiations in Ground One should be denied on the merits; the remainder of Knapp's ineffective assistance of counsel claims in Ground One should be dismissed as procedurally defaulted; and Knapp's claim with respect to her postconviction hearing in Ground One should be denied as not cognizable on federal habeas review.

The undersigned **DENIES** Knapp's request for an evidentiary hearing (*see* Doc. 2, p. 48) and her Motion for Discovery (Doc. 18).

Dated: May 20, 2015

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).